851 A.2d 134 (2004)
370 N.J. Super. 360
STATE of New Jersey,
v.
Michael G. ZANGER, Defendant.
Superior Court of New Jersey, Law Division, Criminal Part, Camden County.
Decided March 29, 2004.
*135 Lesley M. Sokol, Assistant Camden County Prosecutor, for plaintiff.
Robert G. Harbeson, Haddonfield, for defendant.
COOK, J.S.C.
This case presents what appears as an issue of first impression in this State: is a person who permits another to operate his motor vehicle while the permittee is intoxicated guilty of violating N.J.S.A. 39:4-50(a), if he is too impaired by alcohol, narcotics or drugs to know of the permittee's impaired condition to drive? For the reasons recited below the answer must be yes.

BACKGROUND
Defendant, Michael G. Zanger, appeals his October 29, 2003 Pennsauken Municipal Court conviction for violation of N.J.S.A. 39:4-50(a), permitting Zachary Romanet to operate defendant's car on April 20, 2003, while Mr. Romanet, the permittee, was under the influence of intoxicating liquor.[1] Defendant has a prior DWI conviction. Accordingly, his license was revoked for two years, fines, costs and surcharges were imposed, he was sentenced to serve forty-eight hours in the Intoxicated Driver's Resource Center, and he was ordered to perform thirty days' community service.
A trial de novo was conducted by this Court on the evidentiary record in the Municipal Court proceedings before Judge Piperno. R.3:23-8(a). The record consists of certain factual stipulations between the State and the defendant; the testimony of Pennsauken Police Department Patrolman James Hartnett and William Hertline; and the testimony of the defendant, Michael Zanger, and his expert witness, Dr. Richard Saferstein. The evidentiary record also includes defendant's May 21, 2003 statement to Officer Hartnett made in the presence of defense counsel.

THE EVIDENCE
It is uncontroverted that on Sunday night, April 20, 2003, at 11:40 P.M., defendant was a passenger in his car. Zachary Romanet was driving with defendant's permission. The car went out of control, struck the curbing on the ramp from Route 90 eastbound to Route 130 northbound in Pennsauken, and then flipped and landed on its roof. Mr. Romanet was ejected from the car. He sustained fatal injuries. Defendant sustained minor injuries. Both had blood-alcohol levels above.10%; Mr. Romanet's was .17% and defendant's was .21%.

FACTUAL STIPULATIONS
Defendant stipulated that he was twenty years old and owned the car involved in the fatal accident; Mr. Romanet was eighteen years old; and Mr. Romanet was driving defendant's car at the time of the fatal accident. He gave Mr. Romanet permission to drive to the Philadelphia 76ers *136 playoff game at the First Union Center in Philadelphia. Mr. Romanet had defendant's permission to drive his car to and from the game. Defendant never revoked his permission for Mr. Romanet to drive his car.
They were at defendant's home from 1:30 to 6:30 or 7:00 P.M. on the day of the fatal accident. Each drank two Miller Lite beers in the First Union parking lot. During the game, which lasted until 10:30 P.M., each drank eight or nine sixteen (16)ounce beers. When they left the arena, defendant was impaired. Mr. Romanet told defendant he was "good to drive" home.
Blood-alcohol tests following the 11:40 P.M. fatal accident revealed that defendant had a .21% blood-alcohol concentration level, and Mr. Romanet had a blood-alcohol concentration level of .17%.

DEFENDANT'S STATEMENT TO POLICE
On May 21, 2003, accompanied by his attorney, defendant was interviewed by Officer Hartnett at the Pennsauken Police Department. He said Zachary Romanet came to his house about 1:30 to 2:00 o'clock on the afternoon of April 20, 2003. Both smoked marijuana. They watched some playoff games on television, and remained in defendant's house until 6:30 or 7:00 o'clock. Then they left to go to a Philadelphia 76ers playoff game at the First Union Center in Philadelphia. Defendant gave Mr. Romanet the keys to his Ford Taurus, and allowed Mr. Romanet to drive his car. Mr. Romanet drove defendant's car to the game, with defendant as his passenger. They arrived at the arena parking lot about 7:30 P.M. They stayed in the car while each drank two Miller Lite beers. Then they went inside the First Union Center to watch the game. Each drank eight or nine sixteen (16)ounce beers during the game. The game ended around 10:30 P.M. When they left the game, defendant "was buzzing"; he "felt buzzed". While he "wasn't like unbelievably drunk", he said he felt too impaired to drive. Defendant allowed Mr. Romanet to drive home. Neither was seatbelted. Defendant recalled going through the First Union Center parking lot to Interstate Route 95. Defendant characterized Mr. Romanet's driving as "not overly aggressive but [Mr. Romanet] was more aggressive than [defendant] would be." Defendant said he was asleep when the fatal accident occurred.

DEFENDANT'S TRIAL TESTIMONY
Defendant testified that he and Mr. Romanet were best friends. They smoked marijuana at defendant's house on the afternoon of April 20, 2003. They went to the 76ers game that night. Mr. Romanet drove defendant's car, with his permission. They arrived at the First Union Center parking lot around 7 or 7:30 P.M., and there drank two Miller Lite twelve (12) ounce beers apiece. Then they went inside to watch the game. Their seats were behind the 76ers bench. Defendant described the atmosphere as "electrified", with Allen lverson scoring 55 points and everybody yelling all over the place. During the game, each drank sixteen (16) ounce Miller Lite cans of beer, served in cups. None of the beer vendors questioned their age. By the end of the third quarter, defendant "felt pretty drunk", and didn't feel he had the ability to drive. When they left the game, defendant asked Mr. Romanet if he was okay and Mr. Romanet said he was ready to go. On the way home, defendant fell asleep because he was tired from drinking eleven beers and smoking marijuana.

DR. SAFERSTEIN'S TESTIMONY
Defendant called Richard Saferstein as an expert witness. He has a Ph.D. in *137 chemistry. He agreed that defendant's blood alcohol level was .21%, and Mr. Romanet's was .17%. He testified that Mr. Romanet was significantly intoxicated at the time of the accident, and so was defendant. He opined that defendant was therefore unable to use appropriate judgment, self-control, caution and restraint, and thus made an unwise decision in becoming a passenger in a car driven by a significantly intoxicated person. He said defendant's functions, including the ability to observe and make decisions based on observations, were impaired. On cross-examination, Dr. Saferstein said his expertise in forensic toxicology consists of analysis of alcohol, drugs and body fluids; as well as interpretation of the effects of substances such as alcohol on human behavior. He agreed that defendant's blood-alcohol level could have been a little lower than.21% at 10:30 P.M., when defendant and Mr. Romanet left the First Union Center parking lot after the game. He explained that a "significantly intoxicated" blood-alcohol level is from .13% to .20%. Above.20%, one is "highly intoxicated." He opined that between 6:30 P.M. and 10:30 P.M., when defendant was in the parking lot after the game, defendant went through certain stages, and the deterioration of his judgment increased during each of those stages. Dr. Saferstein explained that while defendant and Mr. Romanet were at the 76ers game, defendant's alcohol level was lower, and he would have been able to observe Mr. Romanet's alcohol consumption, and his observational skills would have been a lot keener. Dr. Saferstein opined that by that time defendant and Mr. Romanet were in the parking lot after the 76ers game, both would have been visibly intoxicated and exhibiting outward manifestations of intoxication.
Dr. Saferstein concluded that since defendant's blood sample was drawn at 12:34 A.M. on April 21, 2003, and he began drinking around 7:00 P.M., he would have consumed the equivalent of fourteen twelve (12)-ounce light beers. He also opined that given the fact the accident occurred at 11:40 P.M., and Mr. Romanet began drinking around 7:00 P.M., and Mr. Romanet's blood-alcohol level was tested at .17%, he would have consumed about a dozen twelve (12)-ounce light beers.

FINDINGS AND CONCLUSIONS
Most of the essential facts in this matter are stipulated or otherwise uncontroverted. For example, defendant owned the car that Mr. Romanet drove to and from the 76ers game. Mr. Romanet was driving defendant's car at the time of the fatal accident. Defendant was age 20; Mr. Romanet was age 18.
The permission element of the offense is also undisputed. Defendant gave Mr. Romanet the keys to his car when they left defendant's house for the 76ers game, and Mr. Romanet kept defendant's car keys throughout the rest of the evening, until the 11:40 P.M. accident. Defendant gave Mr. Romanet permission to drive his car from his house to the 76ers game, and to drive defendant's car home after the 76ers game. Once defendant gave Mr. Romanet his initial permission to drive his car, he never revoked it.
The following facts are also uncontroverted. Defendant and Mr. Romanet smoked marijuana on the afternoon of April 20, 2003 at defendant's house, before they traveled to the 76ers game. Mr. Romanet drove defendant's car to the game. Each drank two Miller Lite beers in the First Union Center parking lot, before going into the arena to watch the 76ers game. During the game, each drank eight or nine sixteen (16)ounce Miller Lite beers. When they left the arena after the game, defendant "was buzzing", he felt *138 "buzzed". He "wasn't like unbelievably drunk", but felt too impaired to drive. Mr. Romanet drove "not overly aggressive but he was more aggressive than [defendant] would be."
It is also undisputed that tests conducted following the accident revealed that defendant's blood-alcohol concentration level was .21%, and Mr. Romanet's blood-alcohol level was .17%.
Dr. Saferstein's calculation, that defendant consumed the equivalent of fourteen twelve (12)ounce light beers during the 76ers game, while Mr. Romanet consumed about twelve twelve (12)ounce light beers, is uncontroverted. So is his opinion that Mr. Romanet was significantly intoxicated; that a person like defendant with a blood-alcohol level of .21% would be highly intoxicated; and that both were visibly intoxicated when they left the 76ers game.
Undoubtedly defendant and Mr. Romanet were both under the influence of alcohol when they left the 76ers game. And when Mr. Romanet drove defendant's car (with defendant's permission) on their trip home, both were under the influence of alcohol.
I find, therefore, that the State has proven by competent credible evidence beyond a reasonable doubt that defendant permitted Mr. Romanet to operate defendant's motor vehicle after the 76ers game on their way home, that Mr. Romanet's blood alcohol concentration level was more than 0.10% (.17%), and he was in an impaired condition to drive.
The only remaining issue is whether the State has proven beyond a reasonable doubt that defendant knew or reasonably should have known of Mr. Romanet's impaired condition to drive. A person who permits another to operate a motor vehicleas defendant admits he didviolates N.J.S.A. 39:4-50(a), if he the permittoreither "knew or reasonably should have known of the permittee's impaired condition to drive." State v. Skillman, 226 N.J.Super. 193, 199-200, 543 A.2d 1016, 1020 (App.Div.1988) (emphasis added).
Defendant asserts that the State did not prove that element. He argues that he cannot be found guilty of permitting Mr. Romanet to operate his car while Mr. Romanet was intoxicated because his own voluntary, self-induced intoxicationhis insobrietynegates a finding that he knew Mr. Romanet, the permittee, was intoxicated. In other words, defendant admits (as the uncontroverted evidence shows) that Mr. Romanet was drunk, but claims he was too drunk to know that Mr. Romanet was too drunk to drive.
That argument must be rejected, because the test or standard for judging the "knowledge" element of the offense is an objective one, not subjective. Thus, even if a permittor lacks actual knowledge of the permittee's impaired condition to drive, he is nonetheless guilty if he "reasonably should have known" of the permittee's impaired condition to drive. Skillman, supra, 226 N.J.Super. at 198, 543 A.2d at 1019 (in a prosecution for an N.J.S.A. 39:4-50(a) offense, the State must show that the owner knew or reasonably should have known of the driver's condition); citing State v. Michalek, 207 N.J.Super. 340, 341, 504 A.2d 155, 156 (Law Div.1985) Referring to this offense as a strict liability offense not requiring proof of mens rea, a "guilty mind" or a specific intent, the Skillman court observed, "[t]hus the basis for imposition of such strict liability rests upon the common-sense reasoning that the violator always has it within his or her control to prevent commission of such an offense by the exercise of reasonable care". Id. at 199, 543 A.2d at 1020 (emphasis added). Hence, the knowledge element of the offense is assessed by an objective standard: what a *139 permittor in the exercise of reasonable care reasonably should have known about the permittee's condition to drive.
Handinhand with this objective standard is the standard for criminal negligence culpability, particularly here, where the defendant was too drunk to know that his permittee was too drunk to drive. The requirement that a permittor either knew or reasonably should have known of the permittee's impaired condition to drive is the approximate equivalent of carelessness, which, in turn, is the approximate equivalent of the criminally negligent standard set forth in N.J.S.A. 2C:2-2b(4). See State v. Brown, 228 N.J.Super. 211, 225, 549 A.2d 462, 469 (App.Div.1988) (carelessness under the motor vehicle code, N.J.S.A. 39:4-97, is the approximate equivalent of the criminally negligent standard set forth in N.J.S.A. 2C:2-2b(4)), rev'd on other grounds, 118 N.J. 595, 573 A.2d 886 (1990). Criminal negligence consists of a gross deviation from the ordinary standard of care. New Jersey Criminal Code Annotated, Comment on N.J.S.A. 2C:2-2b(4) (2004). Under that standard, a person acts negligently with respect to a material element of an offense when he should be aware of a substantial and unjustifiable risk that the material element exists or will result from his conduct. Accordingly, in the context of an N.J.S.A. 39:4-50(a) offense, the risk posed by a permittee's impaired condition to drive must be of such nature and degree that a permittor's failure to perceive it, considering the nature and purpose of his conduct, and the circumstances known to him, involves a gross deviation from the standard of care that a reasonable person would observe in the permittor's situation. The 1971 Commentary, section 6, distinguishes criminally negligent conduct from purposeful, knowing or reckless conduct. Criminal negligence "does not involve a state of awareness ". It is a "gross deviation from the standard of care that a reasonable man would exercise under the circumstances." (emphasis added). It involves a situation where the defendant inadvertently creates a risk of which he ought to be aware, considering its nature and degree, the nature and the purpose of his conduct, and the care that would be exercised by a reasonable person in defendant's situation. Ibid.
Further, while an offender's voluntary intoxication may negate a "specific" intent offense, voluntary intoxication cannot negate the culpability element of general intent offenses involving recklessness or criminal negligence. New Jersey Criminal Code Annotated, Comment on 2C:2-8a and b (2004). Self-induced intoxication which leads to the defendant being unaware of a risk of which he would have been aware had he been sober is immaterial, when recklessness establishes an element of an offense. N.J.S.A. 2C:2-8b. Since self-induced intoxication does not excuse an offense involving a recklessness offense, it follows that voluntary intoxication does not excuse other "general" intent offenses involving criminal negligence or its equivalent, carelessness.
In summary, that element of an N.J.S.A. 39:4-50(a) offense requiring that the permittor "knew or reasonably should have known of the permittee's impaired condition to drive", see State v. Skillman, supra, 226 N.J.Super. at 199-200, 543 A.2d at 1020, is to be determined on the basis of an objective standard of knowledge. Under that objective standard, a permittor's knowledge of a permittee's impaired condition to drive may be inferred where the circumstances are such that a sober person of ordinary intelligence and caution would have had such knowledge. State v. Rowe, 57 N.J. 293, 299 and n. 2, 271 A.2d 897, 900 *140 and n. 2(1970). Plainly stated, a permittor who voluntarily becomes impaired or intoxicated by alcohol, narcotics or drugs should be held to have knowledge of a permittee's impaired condition to drive, if a sober person, of ordinary intelligence and in the exercise of reasonable care, should have known of the permittee's impaired condition to drive. Self-induced intoxication or insobriety does not afford a permittor an excuse or defense.

CONCLUSION
Since defendant, Michael G. Zanger, permitted Mr. Romanet to operate his car with a blood alcohol concentration of 0.10% and more, under circumstances where a sober permittor would have known or reasonably should have known of his permittee's impaired condition to drive, defendant is guilty of violating N.J.S.A. 39:4-50(a). His own intoxication is no defense.
This is defendant's second DWI offense. The sentence is as follows:
 two years' suspension of defendant's driver's license.
 forty-eight consecutive hours imprisonment to be served in the Intoxicated Driver Resource Center (IDRC).
 thirty days' community service. Compliance with this community service obligation shall be monitored by the IRDC.
 A fine of $502. $30 costs. DWI surcharge. $50 VCCB. $75 SNSF.
NOTES
[1] N.J.S.A. 39:4-50(a) prohibits a person from... "permit[ting] another person who is under the influence of intoxicating liquor, narcotic, hallucinogenic or habit-producing drug to operate a motor vehicle owned by him or in his custody or control or permits another to operate a motor vehicle with a blood alcohol concentration of 0.10% or more by weight of alcohol in the defendant's blood..."