**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-1021-14T2
                   A-1343-14T2

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

MARIO J. ADAMS,

      Defendant-Appellant.

_____

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

RAFAEL J. OLMO, a/k/a
RICKY OLMO,

      Defendant-Appellant.

_____

Submitted October 30, 2017 – Decided February 19, 2019

Before Judges Sabatino, Ostrer and Whipple.

On appeal from Superior Court of New Jersey, Law Division, Atlantic County, Indictment No. 13-10-2864.

Joseph E. Krakora, Public Defender, attorney for appellant Mario J. Adams (Michele A. Adubato, Designated Counsel, on the briefs).

Joseph E. Krakora, Public Defender, attorney for appellant Rafael J. Olmo (Michael J. Confusione, Designated Counsel, on the briefs).

Damon G. Tyner, Atlantic County Prosecutor, attorney for respondent (Sevan Biramian, Assistant Prosecutor, of counsel and on the briefs).

Appellant Rafael J. Olmo filed a pro se supplemental brief.

The opinion of the court was delivered by

OSTRER, J.A.D.

Deanna Downs was shot to death to prevent her from testifying against defendant Rafael Olmo regarding a shooting she observed a year earlier. Another witness to the prior shooting, Benjamin Falcon, was threatened not to testify. The State alleged that Olmo orchestrated the murder of Downs and the witness tampering, and defendant Mario Adams was the hired gun. A jury convicted Olmo of the first-degree charges of: murder, N.J.S.A. 2C:11-3(a)(1); procurement of murder, N.J.S.A. 2C:11-3(a)(1) and (2), and N.J.S.A. 2C:11-3(b)(4)(e); murder for the purposes of escaping detection, apprehension, trial,

punishment or commitment for another crime, N.J.S.A. 2C:11-3(a)(1) and (2), and N.J.S.A. 2C:11-3(b)(4)(f); and conspiracy to commit murder, N.J.S.A. 2C:5-2. He was also convicted of second-degree witness tampering, N.J.S.A. 2C:28-5(a) (one count for Downs and one for Falcon); and second-degree conspiracy to commit witness tampering, N.J.S.A. 2C:5-2.

Although the jury was apparently unpersuaded that Adams was the shooter of Downs, it was convinced he was involved in the murder and witness tampering. The jury convicted him of first-degree conspiracy to commit Downs's murder; two counts of second-degree witness tampering of Downs and Falcon; and second-degree conspiracy to commit witness tampering. The jury acquitted Adams of the other first-degree murder charges – murder as consideration for the receipt of money, N.J.S.A. 2C:11-3(a)(1) and (2), and N.J.S.A. 2C:11-3(b)(4)(d); and murder for the purpose of escaping detection, apprehension, trial, punishment or commitment for another crime committed by Rafael Olmo, N.J.S.A. 2C:11-3(a)(1) and (2), and N.J.S.A. 2C:11-3(b)(4)(f). The jury also acquitted Adams of second-degree possession of a firearm, N.J.S.A. 2C:39-4(a); and second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b).

After merger, the court sentenced Olmo to an aggregate term of life imprisonment without parole on the murder, and a consecutive ten-year term with a five-year period of parole ineligibility, on tampering with a witness, Falcon. The court sentenced Adams to an aggregate term of twenty-two years, consisting of a term of fifteen years for conspiring to murder Downs, concurrent with seven years for witness tampering of Downs, but consecutive to seven years for witness tampering of Falcon. The conspiracy to murder sentence was subject to the No Early Release Act, N.J.S.A. 2C:43-7.2.

Defendants raise multiple issues in these back-to-back appeals challenging their convictions, none of which we find meritorious. We focus on three issues: the denial of Adams's motion to sever his trial from Olmo's; the decision to permit a police witness to testify as both an expert and investigating officer; and the decision to replace a juror after jury deliberations had begun. Both defendants raise the latter two points. We also reject defendants' respective challenges to their sentences, although we remand for correction of Adams's judgment of conviction.[1]

---

[1] The sentence was delivered orally. However, the judgment of conviction states that the sentences for the three counts after merger should run consecutively. The State concedes that the judge's oral sentence controls, see State v. Abril, 444 N.J. Super. 553, 564 (App. Div. 2016), and the judgment of conviction should be corrected to match the sentence that was given orally.

4

Following a shooting near her Egg Harbor City apartment complex in October 2009, Downs provided a statement to police that she saw Olmo running from the scene with a handgun. Falcon also provided a statement incriminating Olmo. Olmo was indicted and, by September 2010, received discovery disclosing Downs's and Falcon's cooperation.

Multiple witnesses testified that Olmo wanted Downs and Falcon silenced. Rashid Hamilton testified that, during the course of three conversations, Olmo said he wanted a male and a female witness killed; he offered $20,000 for the female's murder; and had a person, Dontay Matthews, keep an eye on the female. Olmo was going to supply the gun for the murder. Hamilton testified that Marcus Vega was present for two of the conversations. Marcus Vega generally confirmed Hamilton's testimony. Hamilton and Vega both said they rebuffed Olmo's offer.

Matthews gave multiple, inconsistent statements to police. Although he initially denied any involvement in the murder, he ultimately entered into a plea agreement, admitting to his role. He testified that on September 30, 2010, he met Olmo who told him he wanted Downs dead to silence her, and that Adams would perform the killing. Matthews said that Olmo offered him money to

watch Downs, who lived in the same apartment complex as Matthews and bought drugs from him on a daily basis. Olmo gave Matthews a cell phone to communicate with him and Adams. Matthews was supposed to call when he knew Downs was alone.

On October 16, 2010, at around 11:30 p.m., Matthews saw Downs step outside her apartment for a smoke. He called Adams and Olmo to alert them. Minutes later, Downs was shot in the head at close range. Matthews asserted he was in his apartment at the time, which his girlfriend, Tamika Daniels, corroborated. She testified that after the shooting, Matthews left the apartment, saying he was going to get a beer.

The next day, Adams made large cash purchases at an electronics store, including a sixty-five-inch television. Also, following the murder, Adams reportedly made self-incriminating statements. Matthews testified that Adams explained the murder, saying money was "the root of all evil," and Downs was a "snitch" who "had to go." He also testified that Adams said, a few days after the shooting, "I'm out here for murder one and . . . [they] don't have a clue who did that shit."

Vega cooperated with police in return for leniency in other cases against him. Vega told police that he was confident he could get Olmo to talk about the

6

Downs murder. Police set up a controlled purchase of drugs by Vega, and equipped him with a video-recording device. Although the conversation initially pertained to drug dealing, Vega eventually brought up the murder. The conversation was filled with street slang, jargon, and nicknames. Vega interpreted Olmo's statements, as did a police witness, Detective James Scoppa, who testified as an expert, over a defense objection.

In the recording, which we discuss at greater length below, Olmo acknowledged Downs's murder, according to Vega. Scoppa explained that Olmo thought that Hamilton was too hesitant about taking on the job. According to Vega and Scoppa, Olmo admitted he paid someone else $25,000 for killing Downs.

As for Falcon, Olmo stated without jargon or slang, "If [he] love his family he better not" testify. He said he would make Falcon "feel regret for every fucking day that [he] gotta wake up and know somebody in you[r] mother fucking shit got touched if you mother fucking wanna run your mouth." Olmo conjured up various scenarios for Falcon to avoid testifying, including leaving the area, but said he would retaliate if he cooperated. Olmo also discussed the intimidating effect of Downs's murder.

Falcon testified that his friend, George Rodriguez, told him that Olmo would pay him $20,000 not to testify; but if he persisted, both he and his son would be killed. Rodriguez essentially confirmed that account.

Falcon also testified that Adams and another man later approached him in a parking lot, and asked him if he knew what happened to people who testified in court. Falcon said he told Adams he would not testify, but he did not accept the $20,000. Falcon said he thought that if he did, he would be dead the next day.

In support of the State's case against Adams, a cellular telephone expert testified that calls between Matthews and Adams indicated that Adams was home in Hammonton early in the evening on the date of Downs's murder. Later, Adams was in the area of Downs's apartment complex between 10:00 and 10:30 p.m., and then back in the Hammonton area after midnight. A police witness testified, based on cellphone records, that there were multiple communications among Matthews, Adams and Olmo in early October, and between October 15 and 17, 2010. However, the witness admitted he found no evidence of a call from Matthews to either Olmo or Adams shortly before the murder. Although Olmo did call Matthews at 9:52 p.m., and Adams called Matthews twice at around 10:15 p.m.

In a recorded statement to police, Adams denied any involvement in Downs's murder. He admitted that Olmo spoke to him about witnesses in his case, but denied that Olmo ever discussed killing Downs, or paying someone to watch her. Adams stated that the night of the murder, he played video games with a cousin and later picked up Matthews, who told him, "I handled that business," though Adams did not know Matthews was referring to the murder. Adams said that after he learned Downs had been shot, he decided to go home. He also said that Matthews admitted, a few days later, that "he got some money from – whatever . . . [$]2,600."

Olmo testified in his own defense, denying that he meant any ill-will toward Downs. He said that he, Rodriguez and Falcon were all involved in selling drugs in 2009. Regarding the 2009 incident, Olmo said that he and Falcon were outside the apartment complex hanging out and selling drugs. Olmo said he was unarmed. Two masked figures shot at him, striking him in the shoulder. Someone behind him returned fire. Olmo said he thought it was Falcon. Olmo also asserted that Falcon drove Olmo from the scene; Falcon's sister tended to his wound; and Falcon's cousin later drove Olmo within a few blocks of a Philadelphia hospital. Questioned by Philadelphia police, he gave a false name, but police identified him and arrested him on an outstanding warrant.

He was later charged with various weapons offenses and extradited to New Jersey, where he was released on bail. Olmo said he later learned that Shawn Travis and Sandy Thomas were the two men who shot at him. Both were shot themselves, Thomas fatally.

Olmo was indicted in August 2010. He said he received the discovery, which disclosed Downs's and Falcon's statements, months before the fatal shooting of Downs. Olmo said Falcon "was lying on me" and Downs "must have mistaken me for Falcon." He said he told Falcon that if he testified against him, Olmo would say what really happened, implicating Falcon and his family members. But, he denied paying or offering to pay anyone to threaten Falcon, or to shoot Downs.

Olmo also gave his own interpretation of his recorded conversation with Vega, insisting it mainly pertained to drug dealing. He claimed that he gave up drug dealing after he was shot in the shoulder, but Vega persuaded him to get back into it. Olmo claimed he paid $25,000 to buy a kilo of drugs from George Rodriguez, which he robbed from a female drug dealer. The repeated references in conversation with Vega about the "hit" of "old girl" and "bitch," pertained not to Downs's murder, but the robbery of the drug dealer. He claimed he used the word "bird" to refer to a kilo of cocaine. "Work" also meant drugs.

Olmo admitted that he and Vega were discussing Falcon's testimony when he said "if [he] love his family he better not," but Olmo explained that only meant that he would disclose Falcon's true involvement in the 2009 incident.

In response to Olmo's testimony, the State played his statement to police about the 2009 incident, which he gave while he was in jail in Philadelphia. After a Miranda[2] hearing, the court found it was knowingly and voluntarily given. Although Olmo spoke in third person, in answers that were often disjointed, the State suggested he referred to himself when he said a man was shot in the arm, but returned fire in self-defense. If true, that would have contradicted his prior trial testimony that he was unarmed.

Over a defense objection, the State also played a videotape of Downs's contrary statement to police about the 2009 incident. On the night of the 2009 incident, she saw Olmo with a pistol from a distance of forty or fifty feet. She had a clear look at his face because he looked in her direction while he was under the street's lighting. Downs stated she had seen Olmo around the complex multiple times.

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

Olmo's sole supporting witness was Victor Martinez. Martinez testified that Rodriguez – whom he had not seen in several years – admitted to him in December 2013 that Falcon paid him to make a false statement against Olmo.

Adams also denied any involvement in Downs's murder. He admitted he was friends with Olmo, and sometimes bought marijuana from Matthews and smoked it with him. He testified that on the night of the murder, he visited a friend in Egg Harbor City, played video games, then returned home. While checking his mail, a young man told him there was a shooting in Egg Harbor City. In order to find out if he knew the victim, he called Matthews at 12:06 a.m. and Olmo at 12:07 a.m. Matthews told him that someone was shot.

He also wanted to know if Matthews had marijuana to sell. Matthews said he did, so Adams drove to meet him. When he saw police cars in the area, Adams asked Matthews "what the fuck was going on." Although he already knew someone was shot, Adams maintained he was not aware the shooting occurred at Matthews's apartment complex. Matthews replied that "somebody got shot" and he "handled that shit." Adams testified he thought Matthews was referring to the marijuana that he had obtained. Only after he arrived at a nearby Wawa did Adams learn, from a woman he knew, that Downs was the shooting victim. Upon receiving that news, Adams decided to drop Matthews off at the

apartment and return home. Adams denied telling Matthews that he killed Downs, that money was the root of all evil, and Downs was a snitch. He said he made his electronics purchase the day after the murder with cash from the sale of personal jewelry he won by gambling.

In its cross-examination, the State elicited several inconsistencies or variations between Adams's prior statement to police and his testimony about his whereabouts the night Downs was killed; his interactions with Matthews that night; and how he was able to afford his recent television purchase. On cross-examination, Adams admitted he "fabricated" answers to police about his knowledge of whether Downs was a witness against Olmo. The State also highlighted evidence that Adams made multiple phone calls and texts to Matthews and Olmo in the days leading up to and following Downs's murder.

Adams called as a defense witness someone who claimed to see a man matching the description of an associate of Olmo, running from Downs's shooting. Justin Williams testified that he was at Downs's housing complex shortly before midnight, to purchase marijuana. He heard a gunshot, ducked behind a fence, and saw a light-skinned Hispanic male with a gun standing over a female body, and a brown-skinned man standing beside him. Both men ran in separate directions, the Hispanic man passing by Williams. Williams said the

Hispanic man was over six feet tall, had a close-cut beard and corn rows in his hair. Williams said that he knew Adams from the Hammonton area and he was sure that neither of the men he saw was Adams.

Adams also called various family members and his girlfriend to corroborate his movements the night of the murder; his possession of jewelry; and his sale of some of it. Adams's girlfriend confirmed that Adams was a drug dealer.

In the course of deliberations, the judge excused a juror who professed the inability to continue, and replaced him with an alternate. During deliberations, the jury heard a playback of the recorded conversation between Vega and Olmo. The jury's verdict followed three days of deliberations.

## II.

Both defendants contend the court erred in excusing the juror, and in allowing Detective Scoppa to testify as an expert in interpreting the recorded

conversation between Olmo and Vega.[3]  Adams argues that the trial court erred

by not severing his trial from Olmo's.[4]

As for their remaining points on appeal, Adams argues:

POINT II

THE DEFENDANT'S STATEMENT TO POLICE
SHOULD NOT HAVE BEEN ADMITTED BECAUSE
THE CUSTODIAL INTERROGATION BY THE
POLICE VIOLATED DEFENDANT'S FIFTH

---

[3]  In Point I of his brief, Adams argues: "THE DISMISSAL OF JUROR 14 DURING DELIBERATIONS DENIED DEFENDANT HIS RIGHT TO A FAIR TRIAL."  Olmo argues, as Point 8 of his brief, "The trial court erred in removing a deliberating juror from the panel after deliberations had begun, and in denying defendant's motion for a new trial on this ground."  As for the expert, Adams argues, as Point IV, "THE ADMISSION OF THE TESTIMONY OF DETECTIVE SCOPPA AS EXPERT TESTIMONY WAS ERROR."  Olmo argues, "The trial court erred in admitting expert testimony of James Scoppa to 'interpret' phrases in a recorded conversation between defendant and a State witness."  In a pro se brief, Olmo adds, as his POINT I: "THE TRIAL COURT'S ADMISSIBILITY RULING REGARDING INTERPRETATION OR MEANING BEHIND DEFENDANT'S RECORDED CONVERSATION BASED UPON DETECTI[VE] SCO[P]PA'S SO-CALLED EXPERT OPINION, WAS IMPROPERLY MADE IN THE ABSTRACT AND IMPERMISSIBLY DEPRIVED DEFENDANT[']S RIGHT TO A FAIR TRIAL, U.S. CONST. AMENDS VI, XIV; N.J. CONST. (1947) ART. I, PARA. [ ]."  He adds, as his POINT II, "IN THE ABSENCE OF REQUISITE PROCEDURAL NORMS DETECTIVE SCO[P]PA'S ANALYSIS OR COMMENTARY REGARDING LANGUAGE CONTAINED IN DEFENDANT'S RECORDED CONVERSATION AMOUNTED TO NOTHING MORE THAN HEARSAY AND/OR MERE 'NET OPINION.'"

[4]  He argues in Point III of his brief, "IT WAS ERROR FOR THE TRIAL COURT TO DENY DEFENDANT'S MOTION FOR SEVERANCE FROM A JOINT TRIAL."

A-1021-14T2

AMENDMENT RIGHT AGAINST SELF-INCRIMINATION.

    . . . .

POINT V

THE PROSECUTOR'S CROSS-EXAMINATION OF CHARACTER WITNESS, TREVONE ASHLEY CHANCE, WAS IMPROPER, GROSSLY PREJUDICIAL AND DEPRIVED DEFENDANT OF A FAIR TRIAL.  (Not raised below).

POINT VI

THE RECORD IS DEVOID OF SUFFICIENT PROOFS TO PROVE THE TWO SECOND DEGREE WITNESS TAMPERING CHARGES BEYOND A REASONABLE DOUBT.

POINT VII

DENIAL OF THE DEFENDANT'S MOTION FOR NEW TRIAL WAS ERROR.

POINT VIII

THE CONSECUTIVE SENTENCES IMPOSED UPON DEFENDANT WERE EXCESSIVE AND SHOULD BE MODIFIED AND REDUCED.  (Not raised below).

POINT IX

THE AGGREGATE ERRORS DENIED DEFENDANT A FAIR TRIAL.  (Not raised below).

Olmo argues:

16

Point 1

The trial court erred by permitting the prosecution to change its theory of liability at the end of trial, in its accomplice liability and related murder charges given to the jury during the final charge, and in subsequently denying defendant's motion for a new trial on this ground of error (partially raised below).

Point 2

The trial court erred in permitting a statement of Deanna Downs given to the prosecution in the 2009 shooting incident to be admitted into evidence at trial below.

Point 3

The trial court erred in permitting hearsay testimony that Deanna Downs was "afraid" of the defendant.

Point 4

The trial court erred in piercing the attorney-client privilege of defendant's attorney representing defendant in the 2009 shooting case and ordering him to testify at trial below.

Point 5

The trial court erred in admitting statements by defendant, made to interrogators during questioning of the 2009 shooting incident, to be admitted at trial below.

. . . .

A-1021-14T2

Point 7

The trial court permitted improper and unfairly prejudicial other wrongs evidence before the jury.

. . . .

Point 9

Defendant's sentence is improper and excessive.

Olmo, in his pro se brief, adds the following point:

POINT III

THE CUMULATIVE IMPACT OF THE ERRORS DENIED DEFENDANT DUE PROCESS AND A FAIR TRIAL.

III.

We turn first to both defendants' argument that the court erred in allowing a detective to testify as an expert and interpret the meaning of the recorded statements between Vega and Olmo. Olmo asserts that Scoppa exceeded the permissible bounds of expert opinion by relying on his private conversations with Vega as well as his own knowledge of the case. He further argues that Scoppa failed to articulate a basis for his opinion and failed to satisfy the indicia of reliability set forth in State v. Kelly, 97 N.J. 178, 208 (1984). For his part, Adams contends that the jury needed no expert assistance to understand the

Olmo-Vega conversation, and that Scoppa's testimony usurped the province of the jury by encompassing the ultimate issue of guilt.

We shall not disturb the trial court's determinations that Detective Scoppa, based on his years as an undercover officer, was an expert in street slang, and that expert testimony would help the jury understand some of the jargon and slang Vega and Olmo used. See State v. Zola, 112 N.J. 384, 414 (1988) (stating "the necessity for, or propriety of, the administration of expert testimony and the competence of such testimony" are within the trial court's discretion); State v. Hyman, 451 N.J. Super. 429, 446-47 (App. Div. 2017) (holding that expert testimony may assist a juror's understanding of "drug slang and code words"). Nor are we convinced that Scoppa usurped the function of the jury by opining as to the ultimate issue of guilt.

However, the court permitted Scoppa to offer opinions that exceeded the scope of his expertise, or the jury's need for assistance. The court also failed to carefully distinguish between Scoppa's testimony as an expert, and as an investigator.

In Hyman, we held that a trial judge must "guard against opinions that stray from interpreting drug code words, and pertain to the meaning of conversations in general and the interpretation of 'ambiguous statements that

were patently not drug code.'" Id. at 447 (quoting State v. Dukagjini, 326 F.3d 45, 55 (2d Cir. 2003)). Also, an expert should not offer opinions as to words that have already entered the popular vernacular. Id. at 446.

Although there is no blanket bar to a lead investigator serving as an expert, it presents "a delicate situation that requires the trial court to carefully weigh the testimony and determine whether it may be unduly prejudicial." Id. at 454 (quoting State v. Torres, 183 N.J. 183, 580 (2005)). A witness does not testify as an expert when he relies on the facts he has learned in the investigation instead of his specialized experience and training. Id. at 449, 454. Undue credibility is given to an interpretation that is characterized as an expert opinion, but which rests on the investigator's knowledge of the details of his investigation. United States v. Albertelli, 687 F.3d 439, 446 (1st Cir. 2012). "Calling such testimony 'expert opinion' would . . . increase the risk of reliance on information not properly before the jury as data on which 'experts in the particular field would reasonably rely,' Fed. R. Evid. 703, even though the 'field' is merely the facts of the case." Ibid. When a trial court allows a lead investigator to testify as an expert, it should give a limiting instruction to inform the jury that it may reject the expert's opinion and the version of facts consistent with it. Hyman, 451 N.J. Super. at 455.

We have no quarrel with Scoppa's definition of certain terms. For example, in the course of his interpretation, he explained that "stack" means $1000, so "twenty stacks" meant $20,000; "bounce" means to "get away"; "dip" means to leave an area; "bird" is a woman, though Scoppa said it can be used to refer to drugs; "slept on it" referred to missing an opportunity; an "Old Boy" is a general reference to a man; "Papi" is a Hispanic male; and "hit," "rocked"[5] and "touched" are all ways of saying "killed." However, Detective Scoppa's testimony crossed multiple boundaries.

He defined terms that needed no explanation. For instance, a jury presumably is aware that "hit" may mean "kill." Scoppa defined understandable phrases such as, "right then and there," and "he can't hurt me," and translated portions of the conversation that could be easily understood by an average juror, once the slang was defined. Scoppa also did not confine his testimony to the meaning of spoken words.

Scoppa said that his translation was based not only on his knowledge of slang, but "the ins and outs of the investigation . . . all the details from this case," including what Vega told him. He used his knowledge of the investigation to identify people who were referred to only by pronouns, nicknames, or oblique

_____

[5] The trial transcript of the recording reported the word as "rot."

descriptions. He relied on his knowledge of the investigation, not his expertise in street slang, in opining that "old girl," "bitch" and "bird" as used throughout the conversation referred to Downs; "Papi" referred to Falcon; and "that shit happened" referred to the killing of Downs.

Nonetheless, we are convinced that any error associated with the admission of Scoppa's opinion testimony was harmless. See State v. Lazo, 209 N.J. 9, 26 (2012) (holding that in order to reverse conviction because of evidentiary error, there must be a real prospect that the error gave rise to an unjust result); Hyman, 451 N.J. Super. at 457-59 (concluding that a trial court's error in permitting investigator to offer opinion about meaning of drug slang without being qualified as an expert was harmless).

Particularly with respect to Adams, the admission of Scoppa's testimony was not harmful because Adams was never mentioned in the conversation between Vega and Olmo. The parties so stipulated. Furthermore, Scoppa confirmed that Adams was not mentioned. If anything, the absence of any mention of Adams during the extensive discussion of Downs's murder and the intimidation of Falcon supported Adams's defense that he was not involved in the murder and witness tampering.

We also conclude any error was harmless to Olmo. To the extent Scoppa unnecessarily explained language that was already clear to the jury, he did not advance the State's case. In other respects, Scoppa's testimony that relied on his knowledge as an investigative detective – as opposed to an expert in street slang – addressed uncontested issues, such as the persons referenced by nicknames. For example, Olmo agreed with Scoppa that he and Vega were discussing the intimidating effect of Downs's killing on Falcon's willingness to testify when Vega stated, "[E]nd of the day if another witness got their mother fucking face blown the fuck off, right, what makes you think he gonna feel comfortable on saying anything if you couldn't even protect that other witness," and Olmo stated, "Exactly." Olmo also confirmed Scoppa's testimony that "Shid" was Rashid Hamilton, and "Tay" was Dontay Williams.

Regarding more obscure statements, Scoppa's interpretation was cumulative of Vega's testimony. Vega and Scoppa agreed that Olmo was the "Old Boy" who gave the "green light" to killing Downs. They also agreed when Olmo said, "I already set the meeting up for them . . . I needed it done right then and there . . . ." he meant that he had hired a hitman, because he needed Downs killed.

Scoppa confirmed Vega's testimony that he was referring to Hamilton's reluctance to kill Downs when Vega said on the recording, "I told that nigger that shit was easy, that shit was right there in the apartments. . . . That shit, all you gotta do is hop the mother fucking fence, hit Old Girl . . . hit that bitch and bounce," and Olmo replied, "His thing when he kill (inaudible) was – he kept saying, man, I might not get out of there. Don't wanna hear that."

Vega and Scoppa agreed about the meaning of another key exchange in which Vega asked Olmo if he was willing to pay the same price to kill Falcon as he did to kill Downs. Olmo responded, "With the Papi? Yeah Papi same price." Then Olmo disclosed that he "paid a little more" for Downs's killing "because I had to make sure . . . I told the nigger already, yo, boom, boom, get the bitch I give you a little extra. I was like extra five, I gave him twenty-five to get the last one."

Also, any prejudice associated with Scoppa exceeding the proper scope of expert testimony was reduced by Olmo's decision to offer his own interpretation. However, Olmo's explanations were often evasive, rambling, or inconsistent. We note two examples. Although Olmo insisted the foregoing exchange about "hit[ting] that bitch" pertained to the alleged robbery of the female drug dealer, he failed to explain his use of the word "kill." Instead, he denied saying the

24

word.  Second, to explain his mention of his scheduled appearance in court immediately after he discussed killing and silencing Downs – or robbing a female drug dealer, as he contended – Olmo first said he was just "changing in conversation."  Prompted by his attorney, he then said equivocally, "I guess I was talking about money.  I was trying to rack up as much money as I could go possibly take the five year sentence that I was facing.  So I guess I was just letting him know."

In addition, the evidence of Olmo's guilt was very strong.  Vega and Hamilton both testified that Olmo offered them $20,000 to kill Downs.  Matthews testified that Olmo paid him to watch Downs and told him that Adams was going to kill her.  Rodriguez testified that Olmo was willing to kill Falcon to silence him.  Circumstantial evidence, including the proximity in time between the release of discovery and Downs's murder, also pointed to Olmo's guilt.

In concluding the evidentiary error was harmless, we note that the jury heard the recorded conversation multiple times during the trial, and had it replayed during deliberations.  The jury did not ask for a re-reading of Scoppa's testimony.  We are confident that the jury reached its own conclusions about the recording, based on what it heard, in light of the other evidence in the case.

25

IV.

We next consider the trial court's removal and replacement of a deliberating juror. On the afternoon of March 12, 2014, the jury began deliberations, conferring for less than two hours. Before proceedings began the next morning, Juror 14, one of two African-Americans on the jury,[6] sent the court a note stating:

> Unexpectedly, this case has brought me to a very personal place, and as much as I can try, the personal place has an enormous grip. This is not the time, nor the place for personal matters. I am persuaded that it would be best that the alternate juror be utilized for best interest of the case going forward.

The court brought Juror 14 out and asked him, outside the presence of other jurors, to expound on what he had written. He was hesitant to speak in defendants' presence, but added:

> [I]t's just my personal perception of things. And, um, in this country, I found that the pendulum of justice doesn't lean towards a minority, and this case took me to a very personal place. And when you live in this type of country, for even a man like me with reasonable education and so forth. I come back from Wall Street, can't find a job. It's – it's just difficult. You – there's a lot of stuff I can't say, I really can't say. But I just – I don't think, in all fairness, this system – and this is my truth – that this system leans towards the favor of any

---

[6] A third African-American was excused and replaced by an alternate before summations to attend a professional conference.

26

black man, whether they're guilty or not guilty. It just doesn't matter. I just think people – I – I – I just – I don't think the system is fair, and that's my – that's my truth right there.[7]

After a brief unrecorded sidebar discussion between the court and the attorneys regarding the matter,[8] Juror 14 added:

It's the same shit going on. The only difference between this world and this world[9] is this one has much more education, has more resources. . . . And wear suits, all of them are thugs in suits.

The court adjourned to consider the matter, after counsel set forth their positions in writing.[10] When the judge returned to hear argument, both defense counsel suggested that something in deliberations may have provoked Juror 14's expression of concern. The prosecutor asserted that Juror 14's statements would have supplied grounds for excusing him for cause, if made during jury selection,

---

[7] The juror's statement was interspersed with brief acknowledgements from the judge, such as "I see" and "Um-hum."

[8] It was plainly inappropriate to conduct the side-bar conference off the record. See State v. Singletary, 80 N.J. 55, 73 (1979); State v. Green, 129 N.J. Super. 157, 166 (App. Div. 1974); R. 1:2-2.

[9] We suspect that the juror was referring to defendants, and then to the attorneys and other professionals in the courtroom. But, the record is unclear.

[10] Although the court preserved the submissions as court exhibits, they are not included in the record before us.

A-1021-14T2

but Adams's attorney disagreed, provided the juror said he could be fair in this case.

The court declined to further probe into what caused Juror 14 to speak up, to avoid intruding into ongoing deliberations. The judge decided to excuse Juror 14 and replace him with an alternate juror. After theorizing that the juror was "less than candid" during jury selection, the judge summarized the juror's statements and concluded:

> I think they suggest, pretty transparently, an – an incapacity on his part, at this time, to consider the evidence as it has gone in and to follow the law unimpeded by the strong racial resentments of which he did not previously disclose to us. Um, now that the time, uh, for making decisions has arrived, I infer that he feels impelled to tell us that he just can't abide by his oath, and I think to press him further at this point would imprudently intrude on the ongoing deliberative process of the entire jury.
>
> . . . .
>
> A juror has to be, uh, able to review evidence dispassionately through the light of reason. Uh, any doubt about a juror's ability to be fair, uh, I think the case law tells us should be resolved in favor of removing him from the panel. Uh, I find that, uh, to his everlasting credit, uh, [Juror 14] has told us today that he simply can't be fair. Uh, so for those reasons, uh, I'm going to excuse him and we'll replace him with the remaining alternate.

28

In rejecting the suggestion that racial cross-currents within the jury may have prompted Juror 14's statement, the judge noted that the remaining African-American juror had not communicated any concern to the court.

After the verdict, the court denied Olmo's motion for a new trial based on the juror's removal, reiterating its reasons for excusing him.[11] In denying Adams's motion for a new trial, the court rejected counsel's theory that Juror 14's statement was prompted by something in the jury room.

We review, for an abuse of discretion, a trial court's decision under Rule 1:8-2(d)(1) to remove and replace a deliberating juror "because of illness or other inability to continue." State v. Musa, 222 N.J. 554, 564-65 (2015). To protect the right to fair jury trial, our Supreme Court has restricted "inability to continue" to matters that are personal to the juror, and unrelated to his or her interaction with other jurors. State v. Jenkins, 182 N.J. 112, 124-25 (2004); see also State v. Williams, 171 N.J. 151, 163 (2002).

A court may not discharge a juror because he or she disagrees with other jurors. In State v. Valenzuela, 136 N.J. 458, 464, 471-73 (1994), the trial court

---

[11] The court also rejected the argument that the jury had deliberated too long to permit a substitution, noting that the jury had deliberated less than two hours before the substitution, and deliberated for three days after it. Defendants do not renew that argument on appeal.

erred in removing a juror after she stated that fellow jurors were "ganging up" on her, they had a "different opinion" of the case, they were communicating to her that she was a "hindrance," and the jury complained to the judge that she was "very confused." See also State v. Paige, 256 N.J. Super. 362, 380-81 (App. Div. 1992) (stating that the trial court cannot replace a "disgruntled" juror "whose position is at odds with the rest of the jury").

However, a court may excuse a juror whose "emotional condition renders him or her unable to render a fair verdict." Williams, 171 N.J. at 164. For example, a trial court appropriately discharged a juror who complained she pictured her son as the defendant, and reported she was nervous, had a headache, "want[ed] to spit up," was "too emotional," and could not render a fair and just decision. State v. Trent, 157 N.J. Super. 231, 235-36 (App. Div. 1978), rev'd on other grounds, 79 N.J. 251 (1979). In Jenkins, a juror had children the defendant's age. She said, "I just can't make a decision to put him in jail." 182 N.J. at 119. Although she said she was not "the emotional type," and stated in voir dire that she could be fair, she realized that, emotionally, she could not decide the case on the facts. Id. at 120-21. The Court held that the trial court appropriately discharged her. Id. at 127-28.

> A juror who would decide a case based solely on a
> defendant's race violates her oath. A juror who would

decide a case based solely on a personal identification or revulsion with a defendant, without regard to the evidence, also violates her oath. A juror, as in this case, who announces that she cannot obey her oath, follow the law, and render fair and impartial justice cannot remain on the jury. . . . [A] juror who expressly states that she cannot be impartial or that she is controlled by an irrepressible bias, and therefore will not be controlled by the law, is unable to continue as a juror for purposes of Rule 1:8-2(d)(1), and must be removed from a jury.

[Id. at 128.]

The record must "adequately establish[]" the juror's inability to continue. Valenzuela, 136 N.J. at 472-73. At the same time, in ascertaining the reason why a juror wants to be excused, a court must avoid improperly intruding into the jury's deliberations. Musa, 222 N.J. at 569 (noting that the "questioning was limited to assessing circumstances personal to the jurors and not delving into the deliberative process"). The trial judge must assess the juror's demeanor and interpret the juror's statement in context. See Williams, 171 N.J. at 169. The trial judge is in the best position to assess the juror's "stress and concern." Id. at 170. The Court has not required that a trial judge always question other jurors, to corroborate the reasons given by the juror who wants to be excused. Not only is such questioning of each deliberating juror time-consuming, it also may alarm jurors or cause them to speculate about another juror's departure.

31

Applying these principles, we discern no error in the trial court's discharge of Juror 14. He expressly stated that his inability to continue was "personal," explaining the case brought him to a "personal place" with "an enormous grip" and it was "not the time, nor the place for personal matters." He added that it was his "personal perception of things" that the justice system "doesn't lean towards a minority" and the economic system is also unfair.

The judge was in the best position to assess Juror 14's sincerity, and the depth of his emotion, in ascertaining whether he was unable to continue. The court was not obliged to question other jurors about Juror 14. The juror did not hint that his comments originated from a disagreement with other jurors about the facts of the case, which may have warranted clarification.

Juror 14's comments seem more akin to those of the jurors in <u>Trent</u> and <u>Jenkins</u>, than in <u>Valenzuela</u>. The juror's personal view of racial justice and equality prompted him to request being excused. Although he did not say so explicitly, it is clear that he believed that his "personal place" prevented him from fairly deciding the case based on the facts and the law as the court instructed. The judge appropriately exercised his discretion, on this record, to excuse him, and reached that decision in a proper manner.

V.

We turn to Adams's argument that the trial court erred in denying his motion to sever his trial from Olmo's. He claims the substantial evidence at trial that pertained only to Olmo, including his involvement in the 2009 incident, and his recorded conversation with Vega, denied him a fair trial. We are unpersuaded.

The court denied three severance motions by Adams. The first was based on Olmo's prolonged unavailability for trial, which led to a delay for Adams. The court held that Adams had not shown the delay prejudiced his ability to present a defense. In support of the second motion, filed several months later, Adams argued that evidence of the 2009 incident, in which he was uninvolved, would be inadmissible against him and highly prejudicial. Shortly afterward, he sought severance on the grounds that admission of the Olmo-Vega conversation, which did not involve him, would be unduly prejudicial to his defense. Denying the second and third motions together, the court reasoned that some reference to the 2009 incident was unavoidable in order to make both defendants' motives clear. Regarding the Olmo-Vega conversation, the court stated that "[t]his is a murder case, and killing, and a certain amount of chatter about it, uh, is part of the landscape whether Mr. Adams is severed or not." The court concluded that the conversation was not unduly prejudicial to Adams.

Rule 3:7-7 allows two or more defendants to be tried jointly "if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." Indeed, "[w]hen the crimes charged arise from the same series of acts, and when much of the same evidence is needed to prosecute each defendant, a joint trial is preferable." State v. Brown, 118 N.J. 595, 605 (1990); see also State v. Robinson, 253 N.J. Super. 346, 364 (App. Div. 1992) (noting the general preference for trying co-defendants jointly). "Joint trials foster an efficient judicial system, and spare witnesses and victims the inconvenience and trauma of testifying about the same events two or more times." State v. Sanchez, 143 N.J. 273, 282 (1996) (citations omitted).

Nevertheless, "the interest in judicial economy cannot override a defendant's right to a fair trial." Ibid. "If, for any reason, it appears that a defendant or the State is prejudiced by the joint trial, the trial court may sever." State v. Weaver, 219 N.J. 131, 148 (2014) (citing R. 3:15-2(b)). "When considering a motion to sever, a court must balance the potential prejudice to a defendant against the interest in judicial economy." State v. Brown, 170 N.J. 138, 160 (2001). The decision to sever is within the trial court's discretion, and will not be reversed unless it constitutes an abuse of that discretion. Weaver, 219 N.J. at 149.

Generally, "separate trials are necessary when [the] co-defendants' defenses are 'antagonistic and mutually exclusive or irreconcilable.'" Brown, 170 N.J. at 160 (quoting Brown, 118 N.J. at 605-06). However, "the potential for prejudice inherent in the mere fact of joinder does not of itself encompass a sufficient threat to compel a separate trial." State v. Scioscia, 200 N.J. Super. 28, 42 (App. Div. 1985). "The danger by association that inheres in all joint trials is not in itself sufficient to justify a severance . . . ." Brown, 118 N.J. at 605. "A severance should not be granted 'merely because it would offer defendant[s] a better chance of acquittal.'" Scioscia, 200 N.J. Super. at 42-43 (quoting State v. Morales, 138 N.J. Super. 225, 231 (App. Div. 1975) (alteration in original)). Courts have specifically held that severance was not warranted where the only basis for the motion was that some evidence would be admissible as to only one co-defendant, State v. Mayberry, 52 N.J. 413, 421 (1968), or where the evidence against one defendant was stronger than that against the other, State v. Laws, 50 N.J. 159, 175-76 (1967).

Here, Olmo's and Adams's defenses were not antagonistic, mutually exclusive or irreconcilable. Indeed, they both asserted defenses that they did not kill Downs, they had no reason to kill her, and although they did not know who killed her, Matthews had the motive and opportunity to do so. Thus, the most compelling reason recognized by courts to support a severance was not present.

Adams's argument on this point is that the highly prejudicial evidence admitted against Olmo created the potential for the jury to find him guilty by association. Yet, courts have repeatedly held that the danger by association that inheres in joint trials, without more, does not justify a severance. Brown, 118 N.J. at 605. Indeed, joint trials may allow for a more accurate assessment of relative culpability that can sometimes operate to a defendant's benefit. Sanchez, 143 N.J. at 282. For instance, a piece of evidence in Adams's favor was the complete absence of any mention of him in the lengthy conversation between Vega and Olmo about the murder of Downs and the intimidation of Falcon. The verdict returned in this matter clearly showed that the jury believed Adams to be the less culpable of the two.

VI.

Olmo's remaining points do not warrant extended discussion. We discern no merit to Olmo's argument that in order to find him guilty as an accomplice to the murder, the trial court was obliged to instruct the jury that Olmo was an accomplice specifically of Adams, as opposed to "another person." Simply put, the jury was not obliged to identify the trigger-man in order to conclude that Olmo was guilty of soliciting that person to kill Downs. See State v. Norman, 151 N.J. 5, 32 (1997)

36

(holding that the jury was not required to identify the shooter in order to find the defendant guilty as an accomplice).

The court also did not err in admitting Downs's 2009 statement – released to Olmo in discovery – that she observed Olmo flee her apartment complex holding a gun after a shooting. The State offered the statement to rebut Olmo's testimony that Downs must have been mistaken, and he meant her no ill will. The court admitted the statement under the forfeiture-by-wrongdoing doctrine as set forth in State v. Byrd, 198 N.J. 319, 340 (2009); see also N.J.R.E. 804(b)(9). The court held a hearing under N.J.R.E. 104 and heard testimony from the police officer who took Downs's statement. Based on that testimony and the evidence already presented at trial, the court was satisfied by a preponderance of the evidence that Olmo's wrongdoing was intended to, and did, procure Downs's unavailability; and Downs's statement bore an indicia of reliability. See Byrd, 198 N.J. at 352. Furthermore, the admission of Downs's statement does not offend the confrontation clause. Id. at 339; State v. Rinker, 446 N.J. Super. 347, 360-61 (App. Div. 2016). It matters not that Olmo's initial intention was to prevent Downs from testifying in a prosecution pertaining to the 2009 incident, as opposed to a trial for Downs's murder. The critical fact is that Olmo engaged in wrongdoing that made Downs unavailable to provide in court the statement she made previously.

A-1021-14T2

Although Downs's mother stated before the jury that her daughter was afraid of Olmo, defense counsel swiftly objected, and the court delivered a curative instruction, directing the jury not to consider the statement. We presume the jury followed the court's instruction. State v. Loftin, 146 N.J. 295, 390 (1996). In any event, the fleeting remark was inconsequential in the context of the evidence of Olmo's guilt, and provides no basis to disturb the jury's verdict.

Also, the court did not, as Olmo contends, pierce his attorney-client privilege when it compelled his attorney in the case related to the 2009 incident to testify about when he received and then transmitted discovery, disclosing Downs's and Falcon's cooperation, to Olmo. The information simply did not constitute a communication protected by the privilege because it did not concern legal advice. See Hedden v. Kean Univ., 434 N.J. Super. 1, 10 (App. Div. 2013).

Olmo also contends the court erred in admitting into evidence his custodial statement to police regarding the 2009 incident. He argues that his Miranda rights were violated. Given our deferential review of the trial court's findings, see State v. Hubbard, 222 N.J. 249, 262-68 (2015), we shall not disturb the trial court's determination that defendant received the appropriate Miranda warnings; and, despite the length of his incarceration and the lack of food, Olmo was competent,

his will was not overborne, and he was not under the influence of narcotics.[12] Although he initially declined to answer questions before obtaining a lawyer, Olmo persisted in engaging the officers, who explained that they could not discuss the case unless Olmo waived his right to remain silent, which Olmo did. The officers did not violate Olmo's rights in clarifying Olmo's intentions. See State v. Diaz-Bridges, 208 N.J. 544, 569 (2012) (stating that officers may inquire "to clarify the suspect's intent" when "confronted with an ambiguous invocation").

We discern no merit in Olmo's argument that the court erred in allowing the State to refer to the 2009 incident. To reduce the potential prejudice to Olmo, the court prohibited the State from eliciting details about the incident (although Olmo opened the door to such details by discussing the incident in depth in his own testimony). The court properly applied the Cofield factors, see State v. Cofield, 127 N.J. 328, 338 (1992), in concluding that the evidence was relevant to the motive for committing the murder and witness tampering, and its probative value was not outweighed by its apparent prejudice.

---

[12] We note that the trial judge relied in part on his assessment of Olmo's demeanor as reflected in the videotape of his interrogation. As the record on appeal does not include that recording, we have no basis to question that aspect of the court's findings. See State v. Cordero, 438 N.J. Super. 472, 489 (App. Div. 2014) (noting that failure to provide video evidence impeded appellate court's review of the trial court's fact finding).

Finally, we reject Olmo's contention that his sentence was improper and excessive. We note at the outset that the court was compelled to impose a sentence of life imprisonment without parole for Downs's murder. See N.J.S.A. 2C:11-3(b)(4). Thus, Olmo's sentencing argument applies only to the consecutive ten-year sentence for witness tampering.

In support of its sentence, the court found aggravating factors one, N.J.S.A. 2C:44-1(a)(1) ("nature and circumstances of the offense, and the role of the actor"); two, N.J.S.A. 2C:44-1(a)(2) ("gravity and seriousness of the harm inflicted on the victim" including the offender's knowledge of victim's incapacity to resist); three, N.J.S.A. 2C:44-1(a)(3) (risk of reoffending); six, N.J.S.A. 2C:44-1(a)(6) (prior record); and nine, N.J.S.A. 2C:44-1(a)(9) (need to deter). Those factors substantially outweighed any mitigating factors.

We are satisfied that in applying the sentencing guidelines, the judge gave adequate reasons to support the sentence, the sentence is not manifestly excessive or unduly punitive, and it does not constitute an abuse of discretion. See State v. Fuentes, 217 N.J. 57 (2014); State v. Cassady, 198 N.J. 165 (2009); State v. Roth, 95 N.J. 334 (1984). Inasmuch as there were two distinct victims – Downs and Falcon – we discern no error in the imposition of consecutive sentences. See State v. Yarbough, 100 N.J. 627, 643 (1985). The fact that Olmo did not personally shoot

Downs did not preclude the court from finding aggravating factors one and two. The court found those factors based on the "cold-blooded" and "calculated" execution of Downs. The court noted that the harm was not only to Downs but to the "body politic" as it involved "payback for [Downs's] temerity in cooperating with law enforcement."

Olmo's remaining points lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

## VII.

Adams's remaining points also do not warrant extended discussion. As did Olmo, Adams contends his Miranda rights were violated, because he initially stated that he did not want to speak to police. However, he persisted in asking the police about the matter, including asking the officer to ask him some questions. The officer explained that he could not do so unless Adams changed his answer on the Miranda form, which he did. The trial court did not err in concluding that there was no Miranda violation. The police honored Adams's request to remain silent, while clarifying, in response to Adams's voluntary inquiries, whether he wanted to waive that right. See Diaz-Bridges, 208 N.J. at 569.

Adams also challenges the sufficiency of the proofs. Relying on his acquittal for murder and weapon offenses, he contends there was insufficient evidence

41

remaining that he witness-tampered Downs. He also argues there was insufficient evidence that he threatened Falcon with force, so as to raise the witness tampering to a second-degree offense. N.J.S.A. 2C:28-5(a). He also contends the court should have granted his motion for a new trial in part on the basis that the convictions were inconsistent with his acquittal of murder and weapons offenses.

We are unpersuaded. As our system tolerates inconsistent verdicts, the trial court appropriately determined that there was sufficient evidence to support the jury's guilty verdicts, notwithstanding its acquittals. See State v. Muhammad, 182 N.J. 551, 578 (2005) (stating that "[i]n reviewing a jury finding, we do not attempt to reconcile the counts on which the jury returned a verdict of guilty and not guilty"). Although the jury was not convinced that Adams was the trigger-man, there was sufficient proof to conclude that he was part of the conspiracy to kill her and to prevent her from testifying against Olmo. Witnesses implicated him in the conspiracy; Adams engaged in numerous communications with Matthews and Olmo before and after the murder; and he made large purchases after the murder. He travelled to the scene shortly after the murder. There was also sufficient evidence for the jury to find that Adams threatened Falcon with force, including Falcon's trial testimony.

Turning to Adams's sentence, we have already noted that the judgment of conviction must be corrected to conform with the court's oral sentence. The judge stated that the seven-year term for witness tampering of Downs was to run concurrently with the fifteen-year term for conspiracy to murder her. We find no error in the court's imposition of a consecutive term for witness tampering of Falcon, as it involved a different victim. See Yarbough, 100 N.J. at 643.

The court adequately supported its finding of aggravating factors one, N.J.S.A. 2C:44-1(a)(1) ("nature and circumstances of the offense and the role of the actor"); two, N.J.S.A. 2C:44-1(a)(2) ("gravity and seriousness of the harm inflicted on the victim," including the offender's knowledge of victim's incapacity to resist); three, N.J.S.A. 2C:44-1(a)(3) (risk of reoffending); and nine, N.J.S.A. 2C:44-1(a)(9) (need to deter). The court found that those aggravating factors outweighed non-existent mitigating factors.

Adams asked the court to find mitigating factors seven, N.J.S.A. 2C:44-1(b)(7) (defendant has no prior criminal record, or has a substantial period of law-abiding behavior); eight, N.J.S.A. 2C:44-1(b)(8) (defendant's behavior resulted from circumstances unlikely to recur); nine, N.J.S.A. 2C:44-1(b)(9) (the character and attitude of the defendant indicate that he is unlikely to commit another offense); and ten, N.J.S.A. 2C:44-1(b)(10) (amenability to probationary treatment). Although the

43

court did not expressly address those factors, its rejection was implicit. See State v. Bienek, 200 N.J. 601, 609 (2010) (stating that a trial court need not explicitly reject each mitigating factor that a defendant argues, if its reasons for the sentence reveal the court's consideration of those factors).

The court acknowledged in its decision that defendant did not have a prior criminal record. The court noted that Adams disputed the correctness of his presentence report, which noted prior disorderly persons convictions. The court concluded, contrary to mitigating factors eight and nine, that defendant posed a risk of reoffending. Mitigating factor ten is inapplicable when a defendant has been convicted of a crime with a presumption of imprisonment, as Adams was. State v. Sene, 443 N.J. Super. 134, 144-45 (App. Div. 2015).

We also reject Adams's argument that factors one and two "should not be relied upon in a single gunshot murder case." As the judge appropriately found, the conspiracy to murder involved the "cold-blooded" killing of a mother just steps from the front door of her home, her two young children, and her mother. The victim was totally defenseless.

Adams's remaining arguments lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

A-1021-14T2

In sum, the convictions and sentences of both defendants are affirmed. In Adams's case, No. A-1021-14, we remand solely to correct the judgment of conviction, with the State's consent.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-1021-14T2