**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5546-15T3

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

CARL L. DIXON, a/k/a
SHAWN HARTWELL,
CARLE JR L. DIXON,
CARLE DIXON, SHAWN
HARTWELL JR, SHAWN NJ,
MARCUS KING, CARL
DIXON, LAXIR DIXON,
and JOSHUA DURHAM,

    Defendant-Appellant.

_____

Submitted September 13, 2018 – Decided March 7, 2019

Before Judges Koblitz, Ostrer and Mayer.

On appeal from Superior Court of New Jersey, Law Division, Union County, Indictment No. 14-10-0915.

Joseph E. Krakora, Public Defender, attorney for appellant (Susan Brody, Deputy Public Defender II, of counsel and on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent (Arielle E. Katz, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

A jury convicted defendant Carl L. Dixon of second-degree robbery, as a lesser-included offense of first-degree robbery, and simple assault, as a lesser-included offense of aggravated assault, and acquitted him of related weapons offenses. After merger, the court imposed a nine-year term of imprisonment, subject to the No Early Release Act, N.J.S.A. 2C:43-7.2. Appealing his conviction, defendant contends, as plain error: the court failed to bar questioning about his pre-arrest silence; the court allowed the State to introduce into evidence defendant's prior recorded statement which contained prejudicial information; and the court delivered a confusing and prejudicial jury charge. He also contends his sentence was excessive. Having considered these arguments in light of the record and applicable principles of law, we affirm.

I.

At around 6:30 p.m. on a Friday in late July, Joseph Tawiah was robbed as he returned to his post as a security guard of an auto-part shipping business in Elizabeth. Several minutes before, Tawiah had cashed his paycheck at a check casher. A man named Billie Jett had driven him and other coworkers

there. Upon returning, Tawiah walked to a corner store and bought some food and groceries. As he walked back to his workplace, a man behind him called out and ran to catch up with him. Tawiah said he thought the man needed help. He led the man into his booth at the entrance to the auto yard. Once inside, the man brandished a knife and demanded money; he punched Tawiah in the face, splitting open his cheek, as he grabbed him around the neck. He then took Tawiah's money and fled. Tawiah later identified defendant without reservation from a photo array and in court. Tawiah said he got a good look at defendant when he approached him that night and while in the booth.

Jett testified that he and a friend sat outside the auto yard entrance in his car after shuttling the workers to the check casher. He saw a person matching defendant's physical description – tall, light-skinned African American, with dreadlocks – standing near the auto yard, laughing with a second, shorter man with a darker complexion. The two then fled the scene. Fifteen to twenty minutes later, Tawiah emerged from the booth with a bloody face.

A female friend of defendant from the neighborhood testified that she provided a false alibi for defendant at his behest. In her statement to police, she falsely claimed she spent most of the day and night with defendant and was with him at the time the robbery took place.

3

Defendant testified in his own defense. He said he saw Tawiah in the corner store, where defendant had gone with his female friend after spending time with her at a local park. Defendant noticed that Tawiah had a lot of cash when he paid for his items. Defendant claimed Tawiah asked him for drugs, and that Tawiah had purchased drugs in the past from a male friend whom defendant had often accompanied. Defendant told Tawiah he had none, and suggested he talk to a group of young men standing outside the store, a short distance away. As defendant left the store, he saw Tawiah and two young men – one of whom was tall, light-skinned, and had dreadlocks, much like defendant – walk up the hill toward Tawiah's workplace; the other man was shorter and darker. Alone, defendant walked to two liquor stores, then returned to his female friend's house to chat on her porch.

Defendant's credibility was challenged on several grounds. He had an extensive criminal record that was elicited on direct examination in sanitized form. During post-arrest questioning eight days after the robbery, defendant admitted that he heard about the robbery shortly after it occurred from his drug-dealer-friend, and that Tawiah had identified him. The State elicited on cross-examination that defendant did not voluntarily go to the police to exonerate himself and point the blame at the other two young men. Defendant claimed he

A-5546-15T3

was afraid to inculpate another; so, during his custodial interview, he asked to speak to the officers outside the view of the interrogation room's video cameras. However, an officer testified that during the break, defendant did not address the robbery at all. Only after they reconvened before the video camera did defendant point the finger at the two men. The State played the video-recording of the interrogation at trial.

Defendant also admitted that a year after his arrest, he drafted a letter for his female friend to submit to the State, falsely claiming that she left the corner store with defendant, accompanied him to a single liquor store, then returned with him to her house, where he stayed the rest of the night. The friend agreed and composed a letter following his draft with minor stylistic changes. However, after she sent it, she regretted doing so, and admitted that defendant had left her company for as much as a half-hour after saying he was going to the liquor store. That period coincided with the time of the robbery. Defendant said he asked the young woman to lie for him because he was afraid no one would believe his story.

On the other hand, the young woman insisted she truthfully reported that she observed a man approach defendant in the store and ask for drugs, and defendant directed him to the young men standing outside. The defense also

highlighted that defendant's story was consistent with Jett's testimony, as he also saw two men, not one, outside the auto yard gate, who matched the defendant's description of the two men. Notably, Tawiah mentioned only one assailant.

The defense also highlighted an inconsistency between Jett's and Tawiah's testimony. While Jett testified that Tawiah approached him with a bloody face and said he fell down the stairs, Tawiah insisted that he told Jett and others that he was robbed. The defense also stressed that Tawiah delayed reporting the robbery because, he claimed, he was afraid of being fired. The day after the robbery, Tawiah told his supervisor what happened, and the supervisor told him to report it, which he did.

II.

Defendant raises the following points for our consideration:

> POINT I
>
> THE PROSECUTOR'S REPEATED QUESTIONING OF DIXON ABOUT HIS FAILURE TO COME FORWARD TO THE POLICE WITH EXCULPATORY INFORMATION DEPRIVED HIM OF A FAIR TRIAL. (Not Raised Below).
>
> POINT II
>
> THE COURT ERRED IN PERMITTING THE STATE TO INTRODUCE DIXON'S ENTIRE UNREDACTED TWO-PART STATEMENT ON REBUTTAL. (Not Raised Below).

6

POINT III

THE COURT'S JURY CHARGE REGARDING DIXON'S TWO LETTERS TO [HIS FEMALE FRIEND] WAS BOTH CONFUSING AND PREJUDICIAL, AND WOULD NECESSARILY HAVE TAINTED THE JURY'S DELIBERATIONS. (Not Raised Below).

POINT IV

THE NINE-YEAR TERM IMPOSED PURSUANT TO THE NO EARLY RELEASE ACT WAS MANIFESTLY EXCESSIVE.

III.

Defendant did not object to the State's questioning about his silence; its introduction of defendant's entire recorded custodial statement; or the court's jury instruction. Therefore, we consider all three issues as asserted plain error, that is, whether the error was "of such a nature as to have been clearly capable of producing an unjust result." R. 2:10-2. In the context of jury instructions, plain error is a "legal impropriety . . . prejudicially affecting the substantial rights of the defendant and sufficiently grievous to . . . convince the court that of itself the error possessed a clear capacity to bring about an unjust result." State v. Hock, 54 N.J. 526, 538 (1969); accord State v. Montalvo, 229 N.J. 300, 320-21 (2017). Not any possibility of an unjust result will suffice as plain error, only one "sufficient to raise a reasonable doubt as to whether the error led the

7                                                                                    A-5546-15T3

jury to a result it otherwise might not have reached." State v. Macon, 57 N.J. 325, 336 (1971).

Our Supreme Court has "insisted that, in opposing the admission of evidence a litigant must 'make known his position to the end that the trial court may consciously rule upon it.'" State v. Robinson, 200 N.J. 1, 19 (2009) (quoting State v. Abbott, 36 N.J. 63, 76 (1961)). The time to object to a jury instruction is before the jury deliberates. State v. Funderburg, 225 N.J. 66, 79 (2016). While we retain the "authority to 'notice plain error not brought to the attention of the trial court[,]' provided it is 'in the interests of justice' to do so," that authority is "not intended to supplant the obvious need to create a complete record and to preserve issues for appeal." Robinson, 200 N.J. at 20 (quoting R. 2:10-2). Otherwise, the standard of Rule 2:10-2 would "render as mere surplusage the overarching requirement that matters be explored first and fully before a trial court." Ibid.

Applying these principles, we conclude that none of the alleged errors were clearly capable of producing an unjust result.

A.

We turn first to the prosecutor's questioning of defendant. As noted, on cross-examination, the prosecutor elicited that defendant did not speak to the

police about the robbery until he was arrested, although he learned about it the day after it occurred. After eliciting that defendant was "out and about" each day between the robbery and his arrest eight days later, the prosecutor asked, "And all along you knew who had committed this robbery, right?"

At that point defense counsel stated, "I'm going to object," but before the court ruled, defendant answered the question, "Not exactly. I know that I was --" Defense counsel then withdrew his objection, apparently satisfied with his client's answer. The prosecutor then confirmed that defendant could describe, even if he could not name, two men he believed committed the robbery, but he did not disclose that to police until his questioning. The prosecutor also elicited that although defendant asked his female friend to submit a written statement, he never voluntarily provided one of his own.

We reject defendant's contention that the prosecution improperly elicited defendant's pre-arrest silence to impeach him. Although a limiting instruction was warranted, we discern no plain error in the court's failure to deliver one.

"[A] defendant has no right not to speak . . . [and] no duty to speak prior to arrest." State v. Brown, 118 N.J. 595, 613 (1990). It does not violate the right against self-incrimination to admit evidence of pre-arrest silence "if, when viewed objectively and neutrally in light of all circumstances, it generates an

inference of consciousness of guilt that bears on the credibility of the defendant when measured against the defendant's apparent exculpatory testimony." Id. at 615. The court must consider "the probative worth of pre-arrest silence as bearing on credibility . . . in light of all the surrounding circumstances." Id. at 613.

The court may admit evidence of pre-arrest silence if "a reasonable person situated as the defendant, prior to arrest, would naturally have come forward and mentioned his or her involvement in the criminal episode, particularly when this is assessed against the defendant's apparent exculpatory testimony." Ibid.; see also State v. Taffaro, 195 N.J. 442, 455 (2008) (holding that the State may impeach a defendant with his pre-arrest silence if it "'significantly' preceded the arrest" outside "a custodial or interrogation setting" and "a jury could infer that a reasonable person in the defendant's position would have come forward and spoken") (quoting State v. Muhammad, 182 N.J. 551, 571-72 (2005)).

The State may not use pre-arrest silence in its case-in-chief; the State must wait until a defendant testifies and has the chance to explain his silence. State v. Brown, 190 N.J. 144, 159-60 (2007); State v. Marshall, 260 N.J. Super. 591, 597 (App. Div. 1992). Also, the State may not use pre-arrest silence "as

substantive evidence of a defendant's guilt." State v. Stas, 212 N.J. 37, 58 (2012).

Applying these principles, we discern no error, let alone plain error, in the State's questioning to elicit defendant's pre-arrest silence. The silence significantly preceded defendant's arrest. A fact-finder could infer that a reasonable person in defendant's position, after learning that an acquaintance mistakenly accused him of assault and robbery, would attempt to exonerate himself rather than sit idly by until the police found him. While defendant's silence may have had other reasonable explanations, that was a matter for the jury to determine. See Brown, 118 N.J. at 615 (noting that whether defendant's pre-arrest silence "entailed a consciousness of guilt, a desire not to become involved, a feeling that it was simply unnecessary, or a belief that he had already fulfilled whatever duty he had – was a matter, ultimately, for the jury in assessing [the defendant]'s credibility").

We recognize that when evidence of pre-arrest silence is properly admitted, "the trial court should instruct the jury that the evidence of defendant's pre-arrest conduct or silence is admitted for the limited purpose of impeaching defendant's credibility and that it cannot be used as evidence of defendant's guilt." Brown, 190 N.J. at 159; see also Brown, 118 N.J. at 616 & n.3 (noting

that the court carefully instructed the jury that the pre-arrest silence was relevant only to credibility and not probative of the defendant's guilt).

However, the failure to give a limiting instruction does not invariably constitute plain error. The Court in the 2007 Brown case rejected a plain error claim, concluding that "[t]he prosecutor's questions concerning defendant's pre-arrest conduct or silence were intended to impeach defendant's story and assist the jury in evaluating the credibility of defendant's . . . testimony." 190 N.J. at 160-61.

We reach the same conclusion here. The prosecutor's line of questioning was evidently designed to cast doubt about the veracity of defendant's claims that Tawiah mistook him for the robber because he knew defendant from prior drug deals, and that defendant only learned about the robbery the following day from a friend. Notably, the prosecutor did not highlight defendant's pre-arrest silence in her summation, focusing instead on more powerful evidence that challenged defendant's credibility and established guilt. The prosecutor noted that defendant gave inconsistent statements; he admittedly asked his female friend to lie for him; Tawiah unqualifiedly identified him; Jett saw a man resembling defendant leave the scene; and defendant had an opportunity to commit the crime, having left his female friend for as much as a half-hour after

seeing Tawiah display a large amount of cash in the store.  In sum, the absence of a limiting instruction was not plain error.

B.

We also discern no merit to defendant's argument that the court sua sponte should have barred the prosecution from playing defendant's custodial interview.  Defendant contends the material exceeded the scope of rebuttal evidence and contained prejudicial admissions about his prior criminal activities.  We are unpersuaded.

Consistent with its "control over the mode and order of interrogating witnesses," N.J.R.E. 611(a), the trial court exercises "a wide range of discretion regarding the admissibility of proffered rebuttal evidence." Weiss v. Goldfarb, 295 N.J. Super. 212, 225 (App. Div. 1996), rev'd in part on other grounds, 154 N.J. 468 (1998).  Although rebuttal evidence "[o]rdinarily . . . is confined to the contradiction of specific subjects introduced on direct or cross-examination of defense witnesses," the court retains broad discretion to permit any "evidence [that] would properly have been admissible in chief." State v. Provoid, 110 N.J. Super. 547, 557 (App. Div. 1970).  An appellate court shall intervene only in the case of a gross abuse of discretion.  Ibid.

A-5546-15T3

No abuse of discretion occurred here. On direct and cross-examination, defendant presented his version of his whereabouts the day of the robbery. He introduced his connection to a drug-dealer friend as the reason Tawiah approached him for drugs. He addressed his attempt to procure a false alibi from his female friend, and he disclosed his significant prior criminal record.[1] Defendant contended that he wanted to tell the truth but was reluctant to accuse others while on video, so he asked for a break and told the officers off camera about the young men he suspected may have committed the robbery. He also admitted that he did not disclose to the police some of the details he discussed on the witness stand.

In rebuttal, the State called one of the interrogating officers, who disputed defendant's testimony. The officer said that during the break, defendant offered information about unrelated crimes. The officers were not interested, and the recorded interrogation resumed. The State also introduced into evidence the full DVD of the two recorded segments, with certain redactions. Before doing so, the court asked defense counsel if he objected; he said he did not. The State then played the DVD for the jury, assisted by a transcript. The recording

---

[1] He did so without identifying the nature of the crimes. The State had agreed that defendant's convictions would be "sanitized" before defendant took the stand.

revealed that during the interrogation, defendant provided a version of the day of the robbery that differed, in some respects, from his trial testimony. When the interrogation resumed after the requested break, defendant acknowledged on the record that the hallway conversation did not pertain to the robbery. The recorded interrogation also referenced, in passing, defendant's prior criminal record, including identifying it as drug-related.

The admission of the recorded statement involved no error, let alone plain error. The discussion of defendant's criminal record caused defendant no significant prejudice, as he was not charged with a drug-related crime, and he had already admitted that he had a criminal record and associated with a drug dealer. See N.J.R.E. 609(a)(2) (permitting admission of unsanitized conviction record to impeach a testifying criminal defendant, when the convictions are dissimilar to the charged offense if the unsanitized record does not pose a risk of undue prejudice, or the defendant waives objection to the unsanitized record). The court also delivered the model charge on the proper use of prior convictions, warning the jury against using defendant's prior convictions as evidence of guilt in this case.

Furthermore, defense counsel referenced the recorded interview in summation, demonstrating that the defense decision not to object was strategic.

15

In particular, defense counsel highlighted that defendant's description, in his recorded interview, of the two young men who walked off with Tawiah matched Jett's account, although defendant had no idea of Jett's statement. See State v. Marshall, 123 N.J. 1, 93 (1991) (stating that "except in the most extreme cases, strategic decisions made by defense counsel will not present grounds for reversal on appeal").[2]

C.

Defendant also contends the court delivered an erroneous jury instruction regarding evidence of defendant's effort to procure a false alibi through his female friend. In particular, defendant contends the court erred by instructing the jury that it could use that evidence to assess defendant's credibility. Defendant argues this ran afoul of N.J.R.E. 608(a), which prohibits proof of "a trait of character . . . by specific instances of conduct." He also contends the court mischaracterized the draft letter as a prior inconsistent statement.

---

[2] Defendant also contends that his attorney was ineffective in failing to object to the introduction of the recorded interrogation. We shall not reach the issue, which defendant did not raise under a separate point heading, as Rule 2:6-2(a)(6) requires. See Mid-Atlantic Solar Energy Indus. Ass'n v. Christie, 418 N.J. Super. 499, 508 (App. Div. 2011). In any event, as defendant challenges his counsel's strategy, he should raise his claim in a petition for post-conviction relief that would enable consideration of facts outside the trial record. See State v. Castagna, 187 N.J. 293, 374 (2006).

We reject defendant's arguments for two reasons. First, defense counsel expressly invited the court to instruct the jury that the false alibi evidence related to credibility. Second, defendant misplaces reliance on N.J.R.E. 608. The false alibi letters were not introduced to demonstrate defendant's "character for . . . untruthfulness." N.J.R.E. 608(a). Rather, they constitute prior inconsistent statements that demonstrated his lack of credibility about this case.

The prosecutor stated in summation:

> So why would an innocent person ask somebody else to lie for them. [Defense counsel] says there is plenty of reason. He was desperate. And you know what, guilty people are desperate. Guilty people are desperate. That's why he asked her to lie for him and that's why he asked her to write that letter and say they were together every single moment after 6:30.
>
> . . . .
>
> Ladies and gentlemen, the defendant committed this crime. He asked her to lie because he is guilty.

In response, defense counsel asked for a curative instruction.

> I'm also going to object to the . . . I wrote it down so I could quote it. "Guilty people are desperate and that's why he asked her to write that letter." That letter is being used for credibility purposes only, not as substantive . . . evidence in the case. That statement I think clearly runs contrary to that instruction that you're going to give.

17

The court then stated it would instruct the jury that "the letter was being offered for credibility." Defense counsel expressed his satisfaction with the court's ruling. The judge then stated, in advance of the full final instruction:

> Now there is a letter that keeps coming back and forth and being discussed here. That letter and reference to desperate people are – are – are making comments or guilty people are desperate, that should be disregarded by you in terms of guilt or innocence in this case. That letter is only being offered to credibility purposes and I'm going to give you a charge on that also. So you're not to consider it for substantive purposes, but you're to consider it and I'll be more specific when I give you the charge as to credibility.

In the course of the final instructions, the judge returned to the subject of defendant's effort to procure a false alibi. The court reiterated that defendant's letters affected his credibility and were not substantive evidence of guilt.

> We have in this case written statements, S-18 and S-20[3] in evidence, alleged to have been made by the defendant. These statements have been introduced by the prosecution not as evidence of defendant's guilt or [sic] the crimes charged but to affect his credibility on the condition that the jury first determine that the statements were made.

---

[3] S-20 was the letter defendant sent his female friend, asking her to submit a statement in her name on his behalf; S-18 was the outline he provided to guide her in drafting the statement.

A-5546-15T3

The judge then instructed that it was for the jury to determine, as a question of fact, whether defendant wrote the letters and "whether he intended them to be an effort to enlist someone to provide a statement on his behalf."

In the final paragraphs of this section of the jury charge, the judge reiterated that the letters pertained to credibility; also, for the first time, he introduced the concept of consciousness of guilt:

> If you find the defendant wrote the letters and intended them to be an effort to enlist someone to provide a statement of his whereabouts then you may consider them in connection with all the other evidence in the case as an <u>indication or proof of consciousness of guilt</u> on the part of the defendant.
>
> If you find the statements were not made then you must not consider them for any purpose. If you find that only part of the statement was made then you may only consider that part as it may affect defendant's credibility. <u>If you find the statements were made they may be considered solely to determine the defendant's credibility if you believe they do in fact affect such credibility and not as evidence of his guilt.</u>
>
> In this regard in all fairness you will want to consider all of the circumstances under which the claimed prior inconsistent statements occurred, the extent and importance or a lack of importance of the inconsistency on the overall testimony of defendant as bearing on his credibility including such factors as where and when the prior statements occurred, and the reasons if any therefor[ ].

The extent to which defendant's credibility is affected by such inconsistencies if any is for you to determine. Consider the materiality and relationship of such contradictions to the entire testimony and all the evidence in the case.

[(Emphasis added).]

Defendant does not challenge the use of the letters as evidence of consciousness of guilt.[4] See State v. Carter, 91 N.J. 86, 119 (1982) (stating that "consciousness of guilt was suggested by [the defendant's] solicitation of false alibi testimony").  Nor does defendant complain that the judge, by stating the letters could not be used as "evidence of guilt," undercut his instruction that the letters could be used to find consciousness of guilt.  Evidence of consciousness of guilt is evidence of guilt, because "consciousness of guilt . . .  [can] support an inference that [is] inconsistent with innocence or could tend to establish the defendant's intent." State v. Williams, 190 N.J. 114, 125 (2007).

"Our jurisprudence regarding consciousness-of-guilt evidence derives from the principle that certain conduct may be 'intrinsically indicative of a consciousness of guilt,' and may therefore be admitted as substantive proof of the defendant's guilt." State v. Cole, 229 N.J. 430, 454 (2017) (quoting State v.

_____

[4]  He contends, "If [the letters] were admissible at all, it was only as potential evidence of his consciousness of guilt."

Phillips, 166 N.J. Super. 153, 160 (App. Div. 1979)); see also Williams, 190 N.J. at 125 ("It is universally conceded today that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself . . . .") (quoting 2 Wigmore on Evidence § 276 (Chadbourn rev. 1979)).  Thus, the judge's erroneous charge to disregard the letters as substantive proof of guilt only favored defendant.

Rather, defendant challenges the use of the letters as evidence of credibility.  However, defendant may not complain about the instruction that defense counsel expressly invited.  The invited error doctrine disqualifies trial errors that defense counsel "induced, encouraged or acquiesced in or consented to" as grounds for reversal on appeal.  State v. Munafo, 222 N.J. 480, 487 (2015) (quoting State v. A.R., 213 N.J. 542, 561 (2013)).  As the Supreme Court stated in A.R., "This case is not one . . . in which defense counsel merely failed to object to the course selected by the trial judge," as he, in fact, "actively encouraged" that course.  213 N.J. at 561.  The Court has applied the invited error doctrine to a defendant's request for specific jury instructions, stating that "[t]o justify reversal on the grounds of an invited error, a defendant must show that the error was so egregious as to 'cut mortally into his substantive rights.'"

State v. Ramseur, 106 N.J. 123, 282 (1987) (quoting State v. Harper, 128 N.J. Super. 270, 277 (App. Div. 1974)). No such error was committed here.

Defendant also misplaces reliance on N.J.R.E. 608(a), which bars proof of a trait of character, such as untruthfulness, by specific instances of conduct. The judge did not instruct the jury that it could use the letters by which defendant sought to procure a false alibi to find a general character trait of untruthfulness. Nor did the State attempt to introduce evidence of prior false statements pertaining to other cases, or efforts to procure false alibis in response to other charges.

The false statement that defendant attempted to procure pertained to the same subject about which he testified. The judge simply stated that the evidence could affect defendant's credibility. This statement was correct, as the draft letter defendant provided to his female friend was not only false, it was inconsistent with defendant's statement to the police and his trial testimony. For example, in the draft letter, defendant – through his friend – asserted he and his friend went to one liquor store, and then returned to her house. In his custodial statement, defendant made no mention of a liquor store at all. At trial, defendant

stated he went to two stores. N.J.R.E. 608(a) does not bar the introduction of prior inconsistent statements to challenge a witness's credibility.[5]

In sum, the court's instruction does not constitute plain error.

### D.

Finally, we shall not disturb the trial court's sentence. The court appropriately identified and weighed the aggravating and mitigating factors, imposed a sentence within the allowable range, and did not abuse its discretion. See State v. Case, 220 N.J. 49, 64-65 (2014); State v. Roth, 95 N.J. 334, 364-66 (1984). In imposing an aggregate nine-year NERA sentence, the court found aggravating factor three, a risk of reoffending; factor six, the extent of defendant's prior record; and factor nine, the need to deter. See N.J.S.A. 2C:44-1(a)(3), (6), (9). The court's findings were appropriately grounded in the record. Although only twenty-seven years old, defendant already had two prior criminal convictions. After he violated probation, he was resentenced to a four-year prison term. He robbed Tawiah less than a month after his release.

---

[5] The trial court's instruction that the false alibi evidence was relevant both to consciousness of guilt and credibility also comported with the Supreme Court's holding in the 1990 Brown case that pre-arrest silence may be used for the same two purposes.

A-5546-15T3

Defendant contends that the court should have found and given weight to mitigating factor eleven, N.J.S.A. 2C:44-1(b)(11), which requires a finding that incarceration would impose an "excessive hardship" upon the defendant or his dependents. The court acknowledged that defendant had attempted to develop a relationship with his son, but noted that he was not his son's primary caretaker. The court concluded that while prison inevitably imposes a hardship, it did not warrant application of factor eleven. We discern no basis to disturb that finding. See State v. Dalziel, 182 N.J. 494, 505 (2005).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5546-15T3